ALFRED E. BOISAUBIN

*v.*

AMIDEE BOISAUBIN, et al.

L., who was weak-minded and susceptible to slight influences, while resident with A., one of his four brothers, who then apparently dominated him, was attended by A. to the office of a lawyer, where, in A.'s presence, he made his will, by which he gave his entire estate to A., to the exclusion of his other

Boisaubin v. Boisaubin.

brothers, after which A. took the will and endorsed it as the will of L. to A., and retained it until after L. died.—*Held,* that the burden was upon A. to show that the instrument was executed without the exercise of undue influence by him.

On appeal from a decree of the orphans court of Morris county.

*Mr. Bradbury C. Chetwood,* for the appellant.

*Mr. Willard W. Cutler,* for the respondents.

THE ORDINARY.

The decree appealed from refuses to admit to probate a paper purporting to be the will of Louis V. S. K. Boisaubin, who died at Madison, in this state, on the 29th of January, 1892, aged about fifty-three years. The appeal is heard upon the evidence produced before the orphans court and additional testimony introduced in this court.

The disputed paper was drawn on the 17th day of June, 1867, at Morristown, by Henry C. Pitney, Esq., who, at that time, was a practicing lawyer, and, on the same day, executed in the presence of Mr. Pitney and Frederick A. De Mott, since deceased. It, in substance, gives the testator's entire estate to the appellant and nominates Nicholas C. Geoffrey its executor.

When the will was made the testator's estate was worth about $18,000, but afterwards it was depleted, so that at his death it was worth a much smaller sum.

The grounds of contest are—*first,* that Louis Boisaubin lacked testamentary capacity, and, *second,* that the will was the product of undue influence exercised by his brother Alfred, the appellant.

It appears that Louis Boisaubin was the fourth of five sons, and that the appellant was the youngest of those sons. The father died in the year 1843, at the Bloomingdale Asylum for the Insane, in New York, of which he had been an inmate for some time, intestate, leaving a considerable estate, one-fifth of which constituted the greater part of all the property that ever came to the hands of Louis.

Edward Thebaud, an uncle, became administrator of the father's estate and the guardian of the five brothers.

When Louis was thirteen or fourteen years of age he was sent to school in Maryland, where he remained a year, after which he was removed to Seton Hall, at Madison, in this state, where he continued at school until he reached his majority. The evidence does not clearly indicate his mental condition during his school days. Two of his instructors were called to testify concerning it, but they disclaim distinct remembrance and fail to recall more than that he was not considered a bright boy, and that it was his habit to keep aloof from his schoolmates and not participate in their pastimes. Upon the part of the proponents, a schoolmate of Louis for some two years and a half, while he was at Seton Hall, testified that Louis was unusually proficient in his studies, instancing that in algebra he maintained himself at the head of the class of some twenty members.

In 1860 Louis became of age, and about that time was put in possession of his property. Then, he purchased a small house from his brother Edward, and, with the assistance of two servants, established a home of his own, away from his relatives, where he lived for a year. It appears that his style of living was extravagant and also that during the year he became involved in a love affair of which his relatives decidedly disapproved. For these reasons his household was broken up, when the year ended, and he was taken by his uncle to France. When he departed his property was put in the hands of Gustav Thebaud, a cousin, who was a practicing lawyer in New York city. Mr. Thebaud controlled the estate until 1865 or 1866, when his management proved to be so unsatisfactory to both Louis and his brothers that the estate was turned over to Amidee Boisaubin, who held it for about a year, and then, because of legal difficulties with his brother Louis, turned what remained of it—some $10,000—over to Edward Thebaud, the brother of Gustav, who held it until 1877, when he restored it to Louis. Between 1877 and 1880 Louis retained the management himself, and, during that time, the appellant, his brother Alfred, by various means not disclosed, obtained from him almost the entire

Boisaubin v. Boisaubin.

remnant of the estate. In 1880 Edward Thebaud again under-took to manage for Louis and secured for him $1,000 in cash from a man named Chambers and notes of Alfred for $9,000. A year after this the property was turned over to Louis Beauplaud, another cousin, in whose hands it was increased by recoveries from Alfred and a small inheritance from a deceased aunt, and remained until the death of the testator.

The history of the management of this estate corroborates the testimony of the witnesses upon whom I am disposed to rely for the correct estimate of the mental condition and character of Louis Boisaubin. He was not entirely destitute of mental capacity, but he was childish and weak in mind, and not only incapable of understanding business principles and making practical application of them, but also was unable to detect and resist the sophistical reasoning of those who had designs upon his purse or to withstand the appeals of those who were kind to him, and thus was peculiarly susceptible to influences of the moment. To his cousin, Gustav Thebaud, from whose man-agement, after much mistrust and annoyance, his property was taken in 1877, he seemed a poor, weak creature of very feeble intellect, verging upon imbecility, yet that witness, though a lawyer, in the active practice of his profession, did not hesitate to act under such a creature's power of attorney, and under that power sell real estate or to make investments in the name of Louis. To Edward Thebaud he seemed like a child in mind, incapable of managing his affairs, yet Edward also acted under his power of attorney and did not hesitate to pay to him, for his disbursement, the entire income of his estate as it was collected. To Mr. Blanchet, the father-in-law of his brother Edward, he seemed like a child, susceptible to the most trifling influences. Dr. Gray regarded him as the mental equal of "a not bright boy of twelve or fourteen years of age." Henry Bardon thought him to be soft and lacking in business understanding. William Hancock, with whom he boarded for several years, said that he was good-natured and could be induced by kindness to do what-ever was desired of him.

After Mr. Beauplaud took charge of Louis' estate, James P. Albright, a most reputable and respected lawyer, resident in Madison, was employed to institute suits upon Alfred's notes, and, subsequently, to prosecute proceedings to have conveyances by Alfred, in fraud of his creditors, set aside. For some eight years, during which period of time he prosecuted those suits in the courts of New York, Mr. Albright was constantly thrown in contact with Louis. He says that Louis fully realized that Alfred had defrauded him of his moneys, but that he was unable to furnish his counsel with dates and intelligently recite the particulars of his transactions with his brother. He impressed Mr. Albright as simple-minded, like a boy, without continuity or strength of thought. The suits resulted in a favorable compromise, which was confirmed by general releases from Louis, which were tendered and accepted without question as to the capacity of Louis to give them. Nicholas C. Geoffrey, who is named as executor of the disputed will, states that Louis appeared like a boy. He, however, recalls that about the time when the disputed will was made Louis brought to him some mortgages for safe keeping and requested him to receive the interest and pay it to him, Louis, and that a year later Louis took the papers from him to Edward Thebaud because the witness lived so far away that it was inconvenient for Louis to come to him for the income. The fact thus related is significant as indicating that Louis had sufficient capacity to know the value of his property and appreciate his own inability to do business. John McTierney thought that Louis was a little weak-minded but not insane. As an instance of that which he considered weak-mindedness the witness stated that Louis was disturbed when he heard of the death of a man to whom he had loaned some money, and expressed a fear that he would lose both his principal and interest, but afterwards was much relieved when, upon the advice of the witness, he called upon the executor of the dead man's estate and found that he would not suffer loss. The incident, I think, tends more strongly to evince capacity than to establish serious mental deficiency. To Louis Beauplaud he seemed to be boyish, yet he manifested a consciousness

of mental deficiency and a providence against it by begging Mr. Beauplaud to take charge of his papers because he was incapable of doing so safely himself.

A number of letters which Alfred Boisaubin wrote to Louis between 1877 and 1880, when Alfred got from him about all his money, are offered in evidence by the caveators. Those letters exhibit that Alfred exercised an artful control of Louis to the latter's detriment, yet they are couched in terms which could not have been understood by one who was without any business capacity or understanding. Their very terms prove a moderate capacity in the person to whom they were addressed.

Instances in eccentricities in dress and behavior have been given in evidence, which, in a great measure, are accounted for by Louis' extreme obesity and the unconventional society in which he lived.

I need not refer to the two or three witnesses that the proponent produces to show that Louis was of average business capacity.

Thus the proofs of the caveators satisfy me that, under favorable circumstances, Louis was able to make a valid will. I do not doubt, although his capacity was moderate, that it was sufficient to comprehend the character and value of his property and to know his kindred and their natural claims upon his bounty, and the purpose and effect of a will in its relation to them and to those he desired to give his property and the property itself. After his trouble with Alfred, he declared to Edward Thebaud that he would never leave Alfred a cent, and, about the same time, to Mr. Blanchet that he was going to see about his will, thus manifesting his knowledge and purpose of the effect of the will.

There is more difficulty with the second inquiry, whether the will was the product of Alfred Boisaubin's undue influence. The proofs show that in 1867, when the will was made, Alfred and Louis were fast friends. Just previous to that time they had quarreled with their brother Amidee, at Alfred's instance, apparently in defence of the property of Louis, and had caused a suit in equity to be commenced against Amidee, charging him

17

with the misappropriation of the estate of Louis, and thus they were brought together in a friendship which, so far as Louis was concerned, was cemented by his gratitude to the brother who, at personal sacrifice, zealously espoused his cause. In this litigation Alfred was the dominant spirit. It was he who first employed counsel and subsequently attended upon counsel with his dependent brother. The position of Alfred in this litigation is indicated by Mr. Pitney when he says that Alfred and Geoffrey acted for him precisely as they would for a female who had business to attend to and wanted men to assist her. The dominant position of Alfred is well illustrated by the following instances : When Amidee asked Louis his reason for bringing the suit against him Louis replied, "Freddie [his pet name for Alfred] did tell me to do it." Amidee testifies that in January, 1867, he was sick in Alfred's house, and about a time when Alfred ordered him out of the house, Louis one day came to his room and said, "Alfred did tell me to tell you if you didn't like it you could go to the poor-house."

It was a short time after the trouble with Amidee, and while Alfred and Louis still lived together in close friendship, that the will was both made and executed, at a single sitting in Mr. Pitney's private office, in presence of Alfred Boisaubin, the sole legatee. Mr. Pitney has forgotten the particulars of that interview and Alfred Boisaubin has refrained from disclosing them or denying his remembrance of them. Alfred was called to the witness-stand by the caveators to establish, in evidence of undue influence, that after the will was executed he received it from his brother Louis, and, after endorsing it, "Will and Testament of Louis V. Boisaubin to Alfred E. Boisaubin June 17, 1867," with his own hand, as though to impress it as peculiarly his property, retained it until after the death of Louis, but, though admonished, by the character of his testimony, of the inferences that would be drawn from his interposition in the will-making, he did not essay to deny that the will was the product of his undue influence or to explain his connection with it.

It is claimed that as the case stands it exhibits a weak-minded, dependent testator, shown by events at the time of the will-

making, and thereafter, to be peculiarly susceptible to the influ-ences, and under the domination of the favored legatee, living with that legatee, constantly attended by him at the office of counsel, and there, in the presence of that legatee, making a will which gave the legatee his entire estate, to the exclusion of three brothers who had equal natural and, for aught that appears to the contrary, save, perhaps, in the case of Amidee, meritorious claims upon his bounty, and then the immediate surrender of the document so made to that favored legatee and the legatee's significant endorsement of it as his own property and subsequent retention of it for years, after he had deeply wronged the tes-tator and when the testator's bitter feelings of resentment warned him, that if a new will should be made he could not hope to be an object of its bounty; and it is urged that thus sufficient *indicia* of undue influence are presented to raise a presumption against the instrument which, unrebutted, must be fatal to it, and that those *indicia* called so loudly upon the legatee, who also, it is remembered, is the proponent of the will, to explain the situation, that his silence itself becomes a potent factor in strengthening the presumption.

Upon a careful review of this case I am so impressed by the *indicia* insisted upon, and, conspicuously among them, the mental weakness of Louis especially in rendering him susceptible to the influences of the moment, the unbounded control that his brother Alfred exercised over him at the time the will was made, and, indeed, until after he had secured possession of Louis' estate, the apparently active participation of Alfred in the procuration of the will and the unjust provisions of that instrument, all of which remain unexplained by the proponent, that I am unwill-ing to admit the will to probate. I think that the burden of proving that Louis was free from the exercise of undue influence upon his part was cast upon the proponent. He was advised by competent counsel, both in the orphans court and in this court, and had full opportunity to bear the burden, yet, although aware that he knew more than any living witness of the facts bearing upon the crucial points, he deliberately kept aloof from the wit-ness-stand, as if by fear, and made no attempt to bear the *onus*

which was thrown upon him. In the case of *Waddington* v. *Buzby, 16 Stew. Eq. 154,* I had occasion to refer to the precedents here in point. I do not now need to add to them.

The decree of the orphans court will be affirmed.