OF

## THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1901.

WILLIAM J. MAGIE, ORDINARY.

ALFRED REED, VICE-ORDINARY.

In the matter of the application for the probate of the last will and testament of GEORGE G. SICKLES, deceased.

[Filed November 29th, 1901.]

1. A widower, eighty years old and bed-ridden with paralysis, having five children, made a will leaving to one son and his wife, who lived with him, nearly all his property for their lives, influenced to do so by the threat of this son that otherwise he and his wife would leave the testator. —*Held*, that the will was the product of undue influence.

2. The facts that the testator, while still surrounded by the same influences, expressed his gratitude toward the beneficiaries and satisfaction with the will he had made, are not sufficient to prove the absence of undue influence.

233

*Mr. James E. Degnan* and *Mr. Charles H. Ivins,* proctors for the proponents.

*Mr. Edmund Wilson* and *Mr. Frank P. McDermott,* proctors for the caveators.

REED, VICE-ORDINARY.

George H. Sickles died February 12th, 1901, leaving a paper signed by him purporting to be his will. A *caveat* having been filed against its probate, the application for probate in solemn form has been heard.

The caveators object to the probate of the paper upon the grounds—*first,* of imperfect execution; *secondly,* of want of capacity, and *thirdly,* that the deceased was unduly influenced to execute this paper by his son Fred., who is named as executor, and Fred.'s wife, who are the principal beneficiaries. I think that the will was executed with the statutory formalities. The defendant left five children—Addie L. Davis, a daughter, Albert Sickles, John J. Sickles, Frederick Sickles and Homer Sickles, sons. Eight acres of land, upon which there was the homestead, worth between $4,000 and $5,000, two shares of bank stock, his household furniture, farm implements and stocks, constituted all his property. By the paper propounded, the two shares of bank stock are left to his son Albert, and all the rest of his property, real and personal, is left to his son Fred. and Euphemia, the wife of Fred., for their lives, and then to be divided between his other children. Fred. is forty-five years old. The age of Euphemia is not stated, but she is apparently no older than her husband. Each would have a life expectancy of nearly twenty-four years. There is therefore a double chance of an extension of the term beyond the period of the life expectancy of each.

The testator was, at the time of his death, eighty-one years of age. On October 16th last, within a month previous to the execution of this paper, he was stricken with paralysis which left one side of his body entirely useless. Thereafter he was unable to feed himself, to walk or to raise himself in bed. The testimony concerning his mentality after his paralytic stroke is, as usual, most conflicting. I think the weight of it is in favor of

the proponents. The old man was undoubtedly a physical wreck, and his mind was naturally imparied, not only by physical decay but by the disease with which he had been stricken. He seems, however, to have had sufficient intelligence to comprehend the nature and the quantity of his property, as well as the number and identity of his children. The serious question in the case is, whether the paper propounded was the product of his own will.

The caveators insist that it was not, but was the outcome of the undue pressure upon his will, exerted by his son Fred. At the time of the execution of this instrument, with the testator lived Fred. and his wife, all his other children living elsewhere. ·Fred., while still living at home with his father, married in 1884. About 1886 he moved from his father's home at Navesink and with his family settled at Lower Squankum, where they lived for three years. Then Fred. seems to have returned to his father's house, leaving his wife and children with her parents in Lower Squankum. In March, 1891, the wife of the testator died, and on April 25th, 1892, Fred.'s family moved in, at the request, according to Fred.'s statement, of the testator, who said that there was no woman to take care of him. Fred., Euphemia and the testator, thereafter lived together until the death of the latter. Fred. and his wife of course took care of him during his sickness from October 16th, 1900, when he was stricken, to the time of his death, February 12th, 1901.

The will was written by a Mr. Johnson, who was called in to write the instrument by Fred. The position of affairs thus exhibited, is that of an old man with mind enfeebled by age and paralysis, under the surveillance and care of a son and daughter-in-law, executing a will by which such son and daughter-in-law are made the recipients of practically all his property during the lives of his children. The circumstances require a full explanation from the beneficiaries of the circumstances surrounding the execution of this instrument, and after such explanation the question for solution is, whether the will was made in favor of Fred. and his wife as a voluntary recognition of services and care which they had rendered to him or a mark of affection for them and their family, or whether it was the

result of importunity or coercive conduct too strong to be resisted by an enfeebled mind.

The proponents present the long period of services which Fred. had rendered to his father in living with him, working on and about the farm, coupled with the care which he and his wife rendered testator during the period of his sickness, and insist that these services and cares were the inducing cause of the father's testamentary act.

It seems to be manifest, however, that Fred.'s presence at the homestead—at least up to the time of his mother's death—was not because his father needed his services, but because he needed a home. In the language of the father, "he could be kept at home cheaper than elsewhere." Up to the time of the testator's stroke no word had been spoken respecting any wages or any other compensation to Fred. for services. There is, therefore, no ground for supposing that Fred. and his wife were favored because the father wished to compensate them for services rendered to him before his sickness. Indeed up to that time, if the testimony is to be credited, he did not intend to make a will at all, having said that the law made a good enough will. Nevertheless, it may be that the testator, at the last, was so impressed with the kindness shown by Fred. and Euphemia, and also impressed with the relative incapacity of Fred., as compared with the other children, to earn a living for his family, that, induced by this and an affection for the wife and children which had grown up, through their close relationship, he did make this will, influenced by these and no other considerations. If there was nothing in the case but the circumstances already mentioned, the testimony of Fred., denying that he exerted any influence other than kindness upon the testator, might be taken as a sufficient explanation of what would seem an unnatural discrimination against the remaining children, made when the testator was liable to the control of those benefited by the will.

But there is another element in the case. Albert Sickles says that his father told him that he had made his will because Fred. and Euphemia were going away if he did not make it; and Almira Sickles says that on Thanksgiving day she found him crying and saying, "Fred. and Euphemia are going away; she

is going to Fairhaven, and she won't never come back, and I am going to die." The latter witness also says that Fred. and Euphemia both told the testator that they were going away and would not come back.

While proof of declarations of the testator that Fred. or Euphemia had told him that they were going to leave him are not evidential of this fact, they are evidential that such remarks, if otherwise proved, produced a serious effect upon the mind of the testator. Not only Almira says that such remarks were made to the testator by Fred., but that Fred., during the period of his father's sickness, in his father's presence, threatened to move away. Dr. Andrews says that he heard Fred. say "that he would be God damned if he was going to stand it any longer, and would take his family and go to Fairhaven." But the most important witness in respect to such threats is Mr. Johnson, who drew the will and who had possession of it. The substance of Mr. Johnson's testimony is as follows: He says that some days after he had drawn the will he happened to call upon the testator. The testator took him by the hand and pulled him down and said that he wished him to destroy the will he had drawn. Mr. Johnson told the testator that he did not bring it, but would go right away for it and would destroy it in the presence of the testator. Mr. Johnson went home, where his dinner was awaiting him, and while he was at dinner Fred.'s little girl came for him saying that her father wanted him to come over right away. He went and met Fred. at the door, who asked him if his father wished him to destroy the will. Upon being informed that he did, Fred. said: "If that will is destroyed I will be God damned if I don't pack up and get out." Then Mr. Johnson and Fred. went into the sick man's room. There Fred. said to his father: "Pap, do you want Uncle John to destroy that will?" His father said "Yes." "Why do you want it destroyed," asked Fred. His father answered, "It doesn't suit me; I sold to Bert some bank stock, and I want him to have it right away." Fred. said, "If that will is destroyed I will be damned if I don't move." The testator then asked Fred. to sit him up in bed, and said, "Let me talk." He then said, "If I give you a mortgage for $500, won't

that satisfy you?" Fred. said, "No." The old man said that if he would not take that he could not help it; and gave him the will and told him to do as he pleased with it, or something to that effect. Fred. said that he was willing that Mr. Johnson should keep it, and Mr. Johnson took it home with him. This occurred, says Mr. Johnson, about three or four weeks after the will was executed. Although Mr. Johnson has been criticised for his relations with the caveators, I think he was scrupulously truthful.

It is true that there is no direct testimony that any such threats of removal were made at the time the will was executed, but undue influence can seldom be proved by direct testimony; for such influences are usually covert and can only be proved by circumstances. The question is whether the proof of the conduct of Fred. at other times during his father's sickness is sufficient to raise the inference that such conduct induced the execution of this will; for if this will was executed because Fred. had threatened that unless it was made he would leave, I cannot conceive of a more glaring instance of undue influence. The testator, shattered in mind and body, lying helpless, his other children scattered in their own homes, and he dependent upon the care of these two, was at their mercy. To him the idea of being deserted by them was the last disaster, to avert which he would be likely to make any concession; and a will made for the purpose of preventing it would be manifestly fraudulent. Now, if the testimony of Mr. Johnson is to be credited, such a threat prevented the destruction of the instrument on the occasion mentioned.

Proof that an intention to destroy a will was frustrated by the fraud of a person, even although that person may have been the beneficiary, will not prevent the probate of the instrument, if regularly executed. The statute has pointed out the modes in which a will may be revoked, and a mere intention to perform a statutory act of revocation is not a performance of the act itself. This is so, although the execution of the intent was defeated by the most glaring fraud. In *Doe, ex dem. Reed,* v. *Harris, 6 Ad. & E. 209; S. C., 8 Ad. & E. 1,* the testator had thrown a will in the fire from which a relative snatched it. The relative,

upon the request of the testator to deliver the will back to him, pretended to throw it in the fire, and did not. The will was held to be unrevoked. *1 Jarm. Wills 288; Boyd* v. *Cook, 3 Leigh 32; Clingan* v. *Mitcheltree, 31 Pa. St. 25, 26.*

Any relief for the heirs-at-law for such fraudulent conduct can be obtained only in a court of equity, where it has been said the devisee, who, by fraud prevented the revocation, may be decreed to be trustee for those who would have been entitled to the estate if the will had been revoked. *Gains* v. *Gains, 2 A. K. Marsh. 190.*

But while the existence of undue influence at the time of the intended revocation of the will may be insufficient to defeat the probate of the instrument, it may tend strongly to the conclusion that the same influence which prevented its revocation induced its execution. The opportunity for the exercise of this influence at both periods was exactly the same, and was at both periods practically unlimited. While it was natural that Fred. should attend to the business of the testator, it exhibits the scope of his opportunity when it is observed that Fred. saw Mr. Johnson about drawing the will, was present at its execution, and it was executed without the knowledge of the other children, and its existence was accidentally discovered by them by reason of a remark of the testator.

After the discovery by the other children of this will in Fred.'s favor, the boys loudly complained, and I think it is probable that because of these complaints Mr. Johnson first visited the testator after the making of the will, and because of these complaints, it is probable that the testator desired to revoke that instrument. All the boys seemed to be fluent and forcible in speech, and their contentions made the old man unhappy and dissatisfied, but Fred., by reason of his position, had the last word and the controlling influence.

But there is another fact which bears collaterally upon the execution of this instrument. On December 11th the testator made a deed to Euphemia for forty acres of land, the best part of the farm, and the part upon which the house and outbuildings were erected. This instrument was written by Fred., who says that the deed was prepared by the direction of the testator be-

cause of the threats made by the other children that they would law away the estate to break the will. I have no doubt that the position taken by the other brothers in respect to the will induced the execution of the deed, but that the suggestion that the latter should be executed was that of the testator, unaided, I do not believe. The execution of this deed and the circumstances surrounding it are, of course, only important as exhibiting the mind of the testator and his relations with the beneficiaries under the will during his last sickness. I am compelled to the conclusion that Fred., as one means of procuring these papers, held out that he would not remain unless he and his family were provided for. If it be true, therefore, that Fred., during his father's sickness, at the time or previous to the execution of this will, had for the purpose of inducing his father to make it, intimated that otherwise he would leave, such an act, coupled with the considerations already mentioned, the provisions of the will itself, the condition of the father, present a case of undue influence.

But it is said that Fred. denies that he ever made such intimation or threats. He does indeed contradict the testimony, not only of those directly interested in the result of the contest, but also the testimony of Mr. Johnson and Dr. Andrews, who have no pecuniary interest in the litigation. It is again urged that the testator had expressed gratitude and affection towards Fred. and Euphemia, and had spoken of his conviction that the disposition he had made of his property was what he thought was right, and that he called Mr. Ivins, who is a proctor of the proponents, and asked him to be a witness to his statement that the will he had made was his voluntary act and that he wished it to stand.

Edward Oakes says that he called on the testator in the early part of December, and while there Fred. came into the room and the judge (the testator) said, "There is the best friend I have got—no, not the best, his wife comes first and he comes second."

John R. Sickles says that the testator told him, one day in November, "that Euphemia had been the best to him that he ever had with the exception of his wife and mother."

Nimrod Woodward says that he called on the testator January 5th, and that the judge told him that the boys had been raising "old hob" with him for what he had done. Witness replied, "I suppose you have done what you thought was right, you always do it." The testator then said, "Yes, I have done what I thought was right; I don't care what they say."

Mr. Ivins says that he called upon the testator on January 7th, who said that he had sent for him to talk over his affairs. He then proceeded to tell Mr. Ivins that he had made a will giving his property to Fred. and his wife, which his children threatened to break, and that he then made up his mind to give Fred.'s wife a portion of his property by deed, because it would be impossible to upset a deed. He wished Mr. Ivins to say, after testator's death, that the latter had told him that the will was as he intended it, and he never wished it set aside.

Had the testator, when these declarations were made, been in a normal condition of mind, freed from the circumstances which surrounded him, the testimony would be quite persuasive that the act he had executed received his voluntary approval. But it is to be considered that he was still surrounded by the same influences as when the will was made. Fred. was present when testator made the remark to Mr. Woodward, and Fred. brought Mr. Ivins to his father's house to receive his instructions. The same influence which induced the execution of the will would as easily induce the statement made after its execution.

Judge Redfield's remarks that declarations of this character, made after the execution of a will, can be of slight account, since a majority of men, after having once done an act under whatever influences, very easily convince themselves that it is right and feel strong reluctance to change it; and this feeling is more controlling with weak minds, often, than with those of more scope, force and comprehension, and is very sure to exist in an individual of originally strong and decided powers of mind, whose mental faculties have become impaired by age or disease. *1 Redf. Wills 551.*

It was quite natural that the testator, surrounded by the vigilance of Fred.'s family, upon whom he depended for care and nursing, should have desired to please them and secure peace

16

and quiet in his last days.   It is not unnatural that he should praise them and reiterate his content with the provisions of the will he had made.   Taking the testimony altogether, I am of the opinion that the will was made because of the undue pressure exerted upon him by Fred., and that it was not the voluntary act of the testator, induced by gratitude and affection for Fred. and his wife's family.

It should not be admitted to probate.