165 N.J. Super. 1 (1978)
397 A.2d 677
IN THE MATTER OF THE ESTATE OF EVA CHURIK, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued April 18, 1978.
Decided May 31, 1978.
*3 Before Judges HALPERN, LARNER and KING.
Mr. E. Carter Corriston for plaintiff-appellant Saint Vladimir's Orthodox Theological Seminary (Messrs. Breslin and Breslin, attorneys; Mr. Paul A. Dykstra on the brief).
Mr. John Dolan Harrington for defendants-respondents Pauline Snyder and George Snyder (Messrs. Winne, Banta, Rizzi & Harrington, attorneys; Mr. Jerrold R. McDowell on the brief).
PER CURIAM.
This is an appeal from a judgment determining that the will of testatrix Eva Churik is valid and should have been admitted to probate. The essence of the trial judge's conclusion was that the contestant, Saint Vladimir's Orthodox Theological Seminary, had failed to establish its claim that the will was the product of undue influence.
*4 The determination of a will contest founded on an allegation of undue influence is characteristically dependent upon an evaluation of facts and inferences therefrom by the judge who sees and hears the witnesses and is in the best position to weigh the evidence. The trial judge herein performed this function and, after a consideration of the credibility of the witnesses and the weight of disputed facts and inferences, reached the conclusion that there was no evidence that the beneficiaries under the will exercised any form of undue influence upon decedent which destroyed her free will and impelled her to make a disposition in a manner which she did not wish to do. See In re Davis, 14 N.J. 166 (1953); Gellert v. Livingston, 5 N.J. 65, 73 (1950).
We have carefully canvassed the record and are satisfied that the determination below could reasonably have been reached on sufficient credible evidence in the record. As a reviewing court it is beyond the ambit of our power and function to apply an independent factfinding process in order to reach a conclusion which may be more in harmony with our viewpoint. State v. Johnson, 42 N.J. 146, 162 (1964). Our task is complete if we find sufficient credible evidence in support of the trial court's decision, unless we are "thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction." Ibid. We do not conclude that the finding below is clearly a mistaken one or plainly unwarranted and therefore do not consider it legally appropriate to disturb it.
The contestant complains that the trial judge failed in his findings to afford it the presumption of undue influence arising out of the alleged confidential relationship between the decedent and her niece-beneficiary. See In re Rittenhouse, 19 N.J. 376 (1955). It is doubtful whether the facts herein would justify the presumption urged by the contestant. The proofs demonstrate that the niece-beneficiary was reconciled with testatrix in 1973 after an estrangement *5 of over 20 years. While the niece undertook to make arrangements for testatrix to be moved from a hospital to a nursing home, took steps to find a new lawyer at decedent's request and to secure information as to the assets of the estate from the former lawyer, and had expressed distrust of the former lawyer who had a power of attorney from decedent and was a beneficiary and executor under her earlier will, nevertheless there is no evidence that the niece was a confidant of decedent or had a dominant position in their relationship. See Stroming v. Stroming, 12 N.J. Super. 217, 224 (App. Div. 1951); In re Fulper, 99 N.J. Eq. 293 (Prerog. 1926); Dill v. Dill, 118 N.J. Eq. 374 (Ch. 1935), aff'd 119 N.J. Eq. 467 (E. & A. 1936).
Under such circumstances the presumption urged by the contestant would not apply.[1]
However, even if we were to assume that there was the requisite confidential relationship triggering the presumption, there is substantial evidence to rebut the same and to negate the charge that undue influence was exerted upon decedent so as to overcome her will. See the dissenting opinion of Judge Morgan in In re Estate of Lehner, 142 N.J. Super. 56, 67-69 (App. Div. 1975), which was adopted by the Supreme Court in 70 N.J. 434 (1976).
It is undisputed that decedent was an individual with a strong mind and will and in full control of her mental faculties at the time she executed the instrument in question. There is no question of her competency or compliance with the statutory prerequisites for the execution of a will which was prepared by an independent attorney who conferred with decedent on two occasions before execution.
It is also significant that the new will did not create an unnatural bequest. It substituted a close blood relative *6 and her husband for the contestant and related minor beneficiaries who were included in the prior will. Although there was a long estrangement between the niece's family and decedent prior to 1973, the care and attention given by this niece in contrast to the lack of such care and attention by the prior related beneficiaries during the last year of her aunt's life renders it quite normal and natural for decedent to forgive the past and prefer her to the former beneficiaries. Manifestly a testator is not locked into beneficiaries who have been named in prior wills. She is free to leave the estate to anyone she pleases so long as it is accomplished in accordance with law and without coercion or undue influence which overcomes her will.
Whatever may have been the motives which inspired the niece to lavish this attention on her aunt during this period, or whether such attention may have influenced decedent to change her will, is not determinative. As pointed out by the Supreme Court in In re Hale's Will, 21 N.J. 284 (1956):
[M]otive and opportunity to exercise undue influence were not sufficient in themselves to invalidate a testament, and short of it appearing that the motive was pursued and opportunity was employed so as to destroy the freedom of will and judgment of the testator, the document purporting to be his last will must be upheld, In re Neuman's Estate, 133 N.J. Eq. 532 (E. & A. 1943); In re Dyer's Will, 135 N.J. Eq. 58, 61 (E. & A. 1944); In re Filo's Estate, 9 N.J. Super. 146 (App. Div. 1950). [at 288]
Finally, we have considered appellant's argument relating to the limitation of examination of Pauline Snyder as to decedent's assets prior to the execution of the will. We find this contention to be without merit. The trial judge's rulings were appropriately within his sound discretion in keeping the trial within bounds. Evid. R. 4.
Affirmed.
HALPERN, P.J.A.D. (dissenting).
I am unable to agree with the conclusions reached by the majority that insufficient *7 evidence was presented by the contestant to establish that a confidential relationship existed between testatrix' niece, Pauline Snyder, and testatrix so as to trigger a presumption of undue influence; or that if the presumption did exist, "there is substantial evidence to rebut the same and to negate the charge that undue influence was exerted upon the decedent so as to overcome her will." In the discussion which follows it must be borne in mind that Mrs. Snyder did not testify in her own behalf but was called as a witness by the contestant, and the trial judge considered the contestant bound by her testimony. This despite Evid. R. 20 which has removed the limitation upon the ability of a party to impeach his adversary when he calls him as a witness. See Becker v. Eisenstodt, 60 N.J. Super. 240, 248-249 (App. Div. 1960).
As indicated, the narrow issue before us is whether a confidential relationship existed between testatrix and Mrs. Snyder so as to trigger the presumption of undue influence. A confidential relationship arises where trust and confidence are reposed by reason of the testator's weakness or dependence. In re Hopper, 9 N.J. 280 (1952); Stroming v. Stroming, 12 N.J. Super. 217 (App. Div. 1951), certif. den. 8 N.J. 319 (1951). Where the will benefits one standing in a confidential relationship and there are additional circumstances of a suspicious character requiring explanation, the law presumes undue influence and the burden of going forward with proof to rebut it shifts to the proponent. In re Rittenhouse's Will, 19 N.J. 376 (1955); In re Davis, 14 N.J. 166 (1953); In re Hopper, supra. The "additional circumstances" need only be slight. In re Estate of Lehner, 70 N.J. 434, 436 (1976); In re Blake's Will, 21 N.J. 50 (1956); Collert v. Livingston, 5 N.J. 65 (1950); In re Weeks, 29 N.J. Super. 533 (App. Div. 1954); Stroming v. Stroming, supra; In re Sparks' Case, 63 N.J. Eq. 242 (Prerog. 1901).
*8 Therefore, it is essential to point to the relatively undisputed facts revealed by the proofs to support the conclusion that a confidential relationship existed.
(1) Following the death of testatrix' husband in about 1950, bitter inter-family disputes arose between testatrix, Mrs. Snyder and testatrix' sister, Mary Hnatew (mother of Pauline) which need not be detailed. This resulted in Mrs. Snyder not seeing or communicating with testatrix for over 20 years.
(2) In 1973 testatrix, who was then in her 80s, was hospitalized in Jersey City, where she had always resided, due to a serious colostomy operation. It was at this time that Mrs. Snyder visited testatrix at the hospital. In 1974 she assumed the responsibility for selecting and arranging for testatrix' admission to a nursing home in Westwood, located in the northern part of Bergen County near Mrs. Snyder's home.
(3) Prior to testatrix' husband's death, and until she was placed in the nursing home, her legal affairs were handled by Fiorvanti Miniutti and, subsequently, with his associate, Joseph Nester, both of Jersey City. It is clear that a close personal and confidential relationship existed between testatrix and her attorneys until her removal to the nursing home.
(4) Commencing in February 1952 and continuing through April 1969, testatrix' attorneys prepared and she executed nine wills and two codicils. The general pattern of the previous wills was of small bequests to relatives and friends, which changed somewhat from will to will. However, none of the wills ever left the entire estate to any one relative or friend.
In addition, all the wills made provisions for bequests to several churches. The first through the fourth wills devised and bequeathed the residuary estate to a religious orphanage home; the fifth divided the residue equally between the orphanage and the contestant, and the sixth through ninth wills bequeathed the residue entirely to *9 the contestant. It is clear from the record that testatrix was a devoutly religious person who desired to perpetuate the memory of her late husband and herself through the religious bequests, as evidenced by the language of the relevant provisions of the wills.
In addition, the nine wills all made detailed provisions for her funeral and burial arrangements, as well as compensation for a designated choir to sing on the anniversary of her death each year.
While the majority's assertion that testatrix "substituted a close blood relative and her husband for the contestant and related minor beneficiaries who were included in the prior will" is factually correct it should be noted that many of these so-called "minor beneficiaries" were as closely related, or more closely related, to testatrix than Mrs. Snyder and her husband. The beneficiaries of the 1969 will (the last one executed before the 1974 will admitted to probate) included six nieces and nephews, three cousins, two sisters, a third sister and her husband, in addition to one other in-law, 12 friends, decedent's housekeeper and the aforesaid religious bequests.
The inference drawn by the majority that testatrix forgave Mrs. Snyder, despite their long estrangement, because of the attention she gave to testatrix in contrast to the lack of such attention by the prior related beneficiaries, is unwarranted. The "care and attention" Mrs. Snyder gave to testatrix is more consistent with the view that she stood in a confidential relationship to her which, in turn, brings into play the presumption of undue influence. Certainly, there is no basis in this record to support a conclusion that the bequest to Mr. Snyder, who did absolutely nothing for testatrix, was a "normal and natural" bequest.
Additionally, Mrs. Snyder testified that testatrix' sister and brother-in-law (Rev. and Mrs. Vladimir Lilikovich) named in the 1969 will had come from Florida at the request of the testatrix while she was in the hospital after the operation. She further testified that testatrix also sought *10 their help in communicating with Nester while she was in the hospital. The 1969 will had bequeathed $10,000 plus certain personal property to them, the largest of the bequests to friends and relatives, but they were completely omitted from the 1974 will.
(5) In May 1974, shortly after testatrix was placed in the nursing home, Mrs. Snyder upon the recommendation of Harry W. Lange, Jr., Mrs. Snyder's personal attorney who had never seen testatrix and who is now attorney for the estate, arranged for an attorney, Eric Stochholm of Short Hills, New Jersey, to visit testatrix. He came to the nursing home on May 29, 1974, where he first saw and spoke to testatrix. He brought with him a general power of attorney wherein he was given power of attorney over testatrix' affairs. The inference is inescapable that this highly unusual procedure was followed on the instructions of Mrs. Snyder.
(6) On June 4, 1974 Stochholm wrote to Nester and advised that he was now in charge of testatrix's affairs, and asked him to turn over to him all of her records. A copy of this letter was sent by Stochholm to Mrs. Snyder. This request caused Miniutti and Nester to go to the Westwood nursing home to learn what was going on.
Upon receiving a telephone call from the nursing home that her aunt had two visitors, Mrs. Snyder admitted that she dressed and hurried there. She confronted Miniutti and Nester and it is undisputed that a heated argument ensued between them and Mrs. Snyder over the management of testatrix' affairs. Miniutti was an executor and trustee under the will in existence at that time, and Nester was an alternate. The argument culminated in Mrs. Snyder's insisting that testatrix choose between her family or the lawyers. Forced into making a choice, testatrix stated that she would choose her family. Mrs. Snyder's own testimony at the trial clearly indicates that she coerced testatrix to make such choice. She testified, among other things:
* * * "Well, it's about time that the three of us had got together so we can straighten things out." * * * And I said now I wanted *11 her to tell them while they were there whether she wanted me to continue to take care of her; whether she wanted me also to take care of her things. Also, whether who was going to be the new lawyer and whether it was she who was going to ask for a new lawyer. I wanted her to explain just what the situation was, and I wanted her to tell them whether she wanted me to take care of her. * * *
While there was some divergent testimony as to the physical condition of testatrix at this time, it is clear that she had difficulty seeing and reading.[1] Accordingly, in such a state of reduced physical capability, she was naturally dependent upon Mrs. Snyder, who had actively placed herself in charge of handling her affairs. The credibility of this conclusion is underscored by the fact that all of her mail was sent to Mrs. Snyder.
(7) On August 1, 1974, about two months after Stochholm came into the picture, he allegedly saw testatrix a second time and obtained instructions from her to prepare a new will.[2] He testified that this conference was held in testatrix' room at the nursing home in the presence of Mr. and Mrs. Snyder. He saw her for the third and last time when he came to the nursing home on August 8, 1974 (about seven months before testatrix died) to have the will executed. Stochholm suggested to Mrs. Snyder that she obtain someone other than an employee at the nursing home to act as a witness with him to the execution of the will.
*12 The will was executed by testatrix and witnessed by Lange and Stochholm while the Snyders were in an adjoining room. The will contained only four clauses, whereas the prior wills contained between 25 and 30 clauses. The first clause authorized the payment of debts, funeral and testamentary expenses, as well as federal estate and state inheritance taxes. The second clause gave the residue to the Snyders or to the survivor of them. The third clause gave the residue to testatrix' sister, Mary Hnatew, in the event the Snyders predeceased testatrix. The fourth clause appointed the Snyders and Mrs. Hnatew executors with general powers of sale of her assets.
Despite the admitted fact that testatrix was a deeply religious person, the will made no provision whatever for the details of the funeral and burial, no religious bequests, no directions for perpetuating the memory of testatrix and her late husband, and no provisions for any of the beneficiaries of the previous wills, except for Mrs. Snyder's mother. Certainly, the evidence of testatrix' prior bequests, which are completely omitted from the 1974 will, should be considered in determining whether undue influence existed. See 3 Page on Wills, § 29.109 at 642-645 (1961); In re Cooper, 75 N.J. Eq. 177 (Prerog. 1908), aff'd 76 N.J. Eq. 614 (E. & A. 1910). It is significant that Mr. Snyder, who had not seen testatrix since 1950 (and at that time had known her only since 1948) did not visit her in 1973 with his wife. He began to visit her in March 1974 and became the beneficiary of half of the residuary estate when the new will was executed five months later.
(8) Stochholm sent all mail pertaining to testatrix to Mrs. Snyder. He testified that when he prepared the 1974 will he did not know testatrix' age, nor the nature and extent of her assets. He also admitted that he did not have a copy of her 1969 will when he discussed the drafting of the new will in order to refresh her memory as to prior bequests. Nor did he question her as to whether she wished to continue *13 to provide for previous beneficiaries. In re Baker's Will, 68 N.J. Super. 574, 588 (App. Div. 1961).
(9) In addition to what has been indicated with respect to Mrs. Snyder, it is clear that she assumed all control over testatrix and her financial affairs, to the exclusion of everyone else. Among other things, she had a power of attorney over testatrix' checking account; she took charge of all of her mail; for all practical purposes, she controlled who was able to see testatrix; she selected a new attorney for testatrix; she took possession of the 1974 will which was admitted to probate and, in short, she displaced those upon whom testatrix relied for many years at a time when testatrix was terminally ill.
Viewed in the light of all the foregoing facts, I am satisfied that a confidential relationship existed between testatrix and Mrs. Snyder when the 1974 will was drawn, and that the trial judge erred in deciding that a presumption of undue influence should not be invoked. In re Blake's Will, In re Rittenhouse's Will and In re Baker's Will, all supra.
The majority's reliance upon In re Estate of Lehner, 142 N.J. Super. 56 (App. Div. 1975), rev'd on the dissenting opinion 70 N.J. 434 (1976), is unwarranted. In Lehner the dissenting judge and the Supreme Court found that a confidential relationship existed, but that the presumption of undue influence had been overcome. Lehner is also distinguishable from the instant case on its facts. In Lehner the three previous wills had made no provisions for the contestants, unlike the situation here. In addition, the will had been in the sole and exclusive possession of the testatrix for a substantial portion of the 2 1/2 years between its execution and her demise, and, as Judge Morgan noted, it could have been easily destroyed at any time had that been her intention. In the instant case Mrs. Snyder, as previously noted, took possession of the will after its execution and retained it by placing it in a safe deposit box, where it remained. See Boisaubin v. Boisaubin, 51 N.J. Eq. 252, 258 (Prerog. 1893). Another distinguishing factor is that the beneficiary *14 in Lehner had not participated "in any step of the procedure" of its drafting and execution, unlike the situation in the instant case where Mrs. Snyder was the dominant party. In addition, the testatrix in Lehner read the will over after it was drafted and was satisfied with it. Stochholm testified that he explained the general provisions of it to decedent, but there is no proof that she read it or was even able to read at that time. In addition, in Lehner there is no evidence that the testatrix was ever compelled to choose between the proponent and others. See In the Matter of Sickles, 63 N.J. Eq. 233, 236-237 (Prerog. 1901), aff'd o.b. 64 N.J. Eq. 791 (E. & A. 1902).
Finally, I find no support for the majority's conclusion that the new will did not result in an unnatural bequest and that it was "normal and natural for the decedent to forgive the past and prefer [Mrs. Snyder] to strangers." The record does not support the conclusion that had the family rifts not occurred Mrs. Snyder and her husband would bave been the sole objects of her bounty, to the exclusion of everyone else. It may be noted that Mrs. Snyder's mother had also been estranged from testatrix over the same disputes, but became reconciled with her before her death. However, when she was added to the eighth and ninth wills she was only bequeathed $1,000. Pursuant to the 1974 will, Mrs. Hnatew was not a direct beneficiary but was merely named as a contingent beneficiary to receive the entire residuary estate if she survived her daughter and son-in-law. It is these bequests which I would term "unnatural" because the proofs in this record are insufficient to overcome the presumption of undue influence.
Finally, I turn to the issue of whether the trial judge erred in excluding evidence of Mrs. Snyder's handling of certain of testatrix' funds. The contestant's attorney attempted to question Mrs. Snyder as to the handling and disposition of insurance checks which she had received from Stochholm, in a further effort to establish the existence of a confidential relationship. Although no objection was made, the trial judge *15 rejected it on his own motion, stating that he did not want to have an accounting. Mrs. Snyder admitted depositing the checks into an account for testatrix and admitted that withdrawals had been made, but the judge would not allow her to consult her records to determine the amounts involved, nor what disposition was made of the funds. The judge's refusal to allow questioning on this vital issue, in view of the fiduciary capacity in which Mrs. Snyder received and held the funds, was an abuse of discretion.
In summary, it is my view the trial judge erred in concluding that a confidential relationship had not been established which required Mrs. Snyder to go forward with proof to rebut the presumption of undue influence. In view of the trial judge's erroneous belief that the contestant was bound by Mrs. Snyder's testimony, it is difficult, if not impossible, to know what weight he gave to her testimony. Nor am I able to agree with the majority that even if the presumption were applied, there was substantial evidence to rebut it. As indicated in In re Baker's Will, supra:
The evidence above recited was such as to require that proponent go forward with her proofs in the presence of the court and that the opportunity be afforded for her cross-examination. The foregoing testimony was of such character as to require full and frank disclosure by proponent of each of her acts in connection with the challenged will, together with the presentation of such other evidence on her behalf as might be deemed relevant to the issue. [68 N.J. Super. at 586]
Accordingly, I would reverse and remand for a new trial.
NOTES
[1] Note that regardless of the question of presumption, the proponent was called as a witness by the contestant and was thus required to disclose all her acts relating to decedent and the will. See In re Baker's Will, 68 N.J. Super. 574, 586 (App. Div. 1961).
[1] A nurse who cared for testatrix at home between the time of her release from the hospital and admission to the nursing home testified that she was unable to see to read her mail and that it was necessary that it be read to her.
[2] The attorney's bill submitted one day after the execution of the will indicated a visit to the nursing home on May 29, 1974, the first visit, when the power of attorney was signed; drafting of the will and its mailing to Mrs. Snyder on August 5, 1974, and his appearance at the nursing home on August 8, 1974 for its execution. The bill made no reference to the alleged visit on August 1, 1974 to obtain the testatrix' instructions for the drafting of the will.