FREDERICK S. DALE, appellant,

*v.*

THOMAS NELSON DALE, respondent.

Where a mother, mentally enfeebled by reason of disease, and in a position where one of her two sons could exercise an improper influence over her, made a will leaving nearly all her property to this son, the burden is upon him to show that such instrument was executed without the exercise of undue influence by him.

This is an appeal from a decree of the prerogative court, admitting to probate the will of Sarah P. Dale, reported in *Dale* v. *Dale, 9 Stew. Eq. 269.*

*Mr. J. S. Barkalow* and *Mr. J. D. Bedle,* for appellant.

*Mr. John Linn* and *Mr. Hamilton Wallis,* for respondent.

The opinion of the court was delivered by

REED, J.

Sarah P. Dale executed her will on the 28th day of April, 1880, and died on May 8th following.

She left two sons, Frederick S. Dale and T. Nelson Dale. She left an estate of about $45,000. She left all her property to T. Nelson Dale and his children, except a legacy of $1,000 each to the two children of Frederick S. Dale.

Frederick S. Dale now attacks this will as a paper made by one who either had not a disposing mind at the time of its execution, or of one who, if possessing a disposing mental capacity, was unduly influenced to make this instrument.

Upon the first ground, while it appears, as will presently be stated, that the testatrix exhibited a considerable degree of physical and mental debility, we do not think that the testimony in the cause presents her as possessing so little capacity as,

Dale *v.* Dale.

within the rule established in this state, would deprive her of the legal power to dispose of her property by will.

This leaves as the remaining question, and one not free from difficulty, What influences induced the testatrix to make the disposition of her property displayed by the terms of this will? The testatrix, as already stated, had two sons, neither of whom, at the time of the making the will, was placed in a position of affluence.  To one was left, with the exception of $2,000, the entire estate of the mother.

While the mother had the legal right to make this discrimination, yet the unusual character of it naturally directs inquiry into the reasons for the exceptional provisions of the will.  Two theories are presented.  One theory is that a disagreement had arisen between Frederick and his mother, growing out of the sale, by her to him, of some machinery in the city of Paterson, which induced a feeling of hostility to Frederick, and that she also wished to put Nelson in a position where he might pursue his profession as a geologist, which was unremunerative, while she thought Frederick could take care of himself, in the business in which he was engaged.

The respondent insists that these were the sole reasons which operated upon the mind of the testatrix, in influencing her in making the present will.

If this be established, then, although the reasons may seem inadequate, this fact affords no ground for judicial interference with the act of the testatrix.

The counter theory is that the mother, while suffering mentally, was moved by the improper influence of the son who is the chief beneficiary under the will, to favor him at the expense of his brother.

The evidence shows that, for a long time preceding her death, Mrs. Dale had been suffering from a disease which accelerated, if it did not directly cause, her death.

The disorder not only produced physical debility, which naturally caused mental debility, but directly affected the brain, by causing the formation of deposits upon the *dura mater*.  Her complaints of headache and forgetfulness, her prolonged condi-

tions of coma, together with the expert testimony relative to the effect of her disorder upon her intellectual and emotional faculties, show that she was susceptible to influences which would not have affected a person of robust physical and mental constitution.

As already stated, the will was made ten days preceding her death.

At the time of signing the will, and also at the time of her death, she was visiting the family of a Mr. Winters, friends of hers, in Philadelphia. She had been at the latter place four weeks, at the time of her death. She had gone there from the house of Nelson, where she had lived from the 5th of February preceding. From this time (February 5th) till about April 1st, she was under the roof of Nelson. From the time she went to Philadelphia till the execution of the will, she was in correspondence with him. The most material part of the correspondence related to the execution of the will. So, for three months preceding the execution of the instrument under which Nelson took the almost entire property of his mother, to the exclusion of a brother, he was in a position in which, by continuous personal presence, or by correspondence following the then personal intercourse, he had the opportunity to exercise, over the unhealthy mind of his mother, an influence in directing the disposition of her property in his favor. The position he thus occupied, by which he had it in his power to exercise a dominant influence over his mother's mind, followed, as it was, by this will, throws the burden upon him, as the beneficiary under its terms, to show that its execution was free from improper influences exerted by him. *Taylor on Ev.* § *160.*

To show this, he relies upon the presence of the other causes for the discrimination in his favor, to which I have already alluded, namely, that his mother had been angered by the conduct of Frederick, in the purchase of the machinery in Paterson, and that his mother wished to place Nelson's family in a position free from care, while he pursued his geological studies. Now, it does not seem probable that a healthy mind, having cognizance of the facts as they appear here, unless influenced by

Dale *v.* Dale.

some motive other than those mentioned, could have made this will.

It is not only unnatural in itself, but it is a disposition of property which the testatrix had herself branded as unnatural. By the testimony of Mr. and Mrs. Kimball, it appears that she, before this, had had a grounded sentiment concerning the injustice of a parent disinheriting a child, remarking that, if her mother disinherited her, she would fight it if it took the last cent she had.

Previous to her residence with Nelson, she had expressed a feeling of regard for Frederick, saying, on one occasion, to Mr. Streiver, that she loved Frederick as well as she did Nelson.

From the time she went to Nelson's, on February 5th, 1880, she was in almost constant consultation with him, apparently concerning her will. He wrote the draft of her will. It was interlined by him. His suggestions were sought at every stage, and adopted.

During all this time, Nelson was unfriendly with Frederick. Frederick was refused admission to see his mother, while at Nelson's. Nelson says the refusal was at the request of his mother, but I think it is apparent that Frederick would have been received by her, had she been elsewhere than at Nelson's house. He not only manifested his unfriendly feeling toward Frederick, but his acts seem to show that he fostered in the mind of his mother the notion that Frederick had acted badly towards his mother. It is in evidence that he advised Mrs. Dale not to yield to the demands of Frederick, in the transaction concerning the sale of the machinery, already mentioned; that, after the death of his mother, he announced that the provisions of the will served Frederick right.

While Nelson was in Philadelphia with his mother, during her last hours, Frederick was not telegraphed for until she was almost unconscious, and then the conduct of Nelson, after his arrival and at the funeral, was such as to lead to the belief that he was prolonging and embittering a strife between himself and his brother, because he felt that no position but that of enmity would be natural, when the terms of the will should be dis-

closed. The evidence, altogether, has impressed me with a conviction that Nelson took advantage of the position in which he and his mother were placed, while under his roof, and by his conversation, fostered the misunderstanding between her and Frederick; that he distorted the conduct of Frederick in the transaction relative to the sale of machinery; that he unduly impressed upon her the necessity for a liberal provision for himself and his family, to aid him in a career which he induced her to believe would reflect honor upon the family name, and that he insinuated that the business position of Frederick was such as to place him above the need of testamentary assistance. Nor do I think the force of the testimony, in this direction, is overcome by the two principal features of the cause relied upon by the beneficiary under the will, to support its validity.

These are, first, that the testatrix had, previous to her death, stated why she intended to make a testamentary disposition of her property as she afterwards did, and, second, that she had been, for some weeks, removed from the personal influence of Nelson at the time she executed her will.

It is, indeed, proven that the testatrix, before the execution of the will, confided to two or three persons the reasons which led her to make this instrument. The statement of the reasons which afterwards led her to make this instrument, only exhibits what notions induced the course she took. If these notions were the result of influences which were improper, they became no less so by the fact that she stated them before the actual execution of the instrument.

Again, it is true that, for about four weeks preceding the date of the execution of the will, the testatrix was not under the roof of Nelson, she visiting Philadelphia while he was at Newport. But this fact does not, upon consideration, have as much force as it did upon first impression.

In the first place, I think that it would occur to Nelson that the fact of the execution of an instrument like this while the testatrix was under the roof of the chief beneficiary, would lead to the gravest inferences that improper influences had been exercised over the mind of the mother. The dictates of common pru-

dence would lead to a postponement of such an act until this condition of affairs was changed. Nor do I think there existed any fear that the impressions which occupied the mind of the mother were likely to be shaken by her removal to Philadelphia. The personal intercourse between mother and son was succeeded by correspondence of the most confidential character. Besides, I am impressed with the conviction that Nelson knew that, while his mother was at the home of Mr. Winters, she was within the circle of influences not unfriendly to himself; that he was convinced that the intentions which she had taken steps, already, to have put in legal shape, were not likely to be altered by the presence of Frederick or the operation of counter influences. This, together with the delay of her lawyer in perfecting and forwarding the final draft of her will, to my mind, is sufficient to explain the separation between Nelson and his mother for this period of time, from the standpoint whence I have viewed this case.

My conclusion is that the will should not be admitted to probate, and the decree below should be reversed.

For affirmance—DEPUE, PARKER—2.

For reversal—THE CHIEF JUSTICE, KNAPP, REED, SCUDDER, VAN SYCKEL, CLEMENT, COLE, PATERSON, WHITAKER—9.