Barkman *v.* Richards.

DAVID F. BARKMAN, appellant,

*v.*

EDITH M. RICHARDS, respondent.

WILLIAM H. BENJAMIN, appellant,

*v.*

EDITH M. RICHARDS, respondent.

[Filed July 22d, 1901.]

1. A testator who was weak-minded and easily influenced, and who was in the last stages of consumption, went to live with a boyhood friend, an active business man, of acute mind. About a month later the testator made his will, leaving all his property to his friend, with whom he was living, and not mentioning a sister, his next of kin. The will was drawn by a lawyer who was named as executor and with whom the beneficiary had his office, and the beneficiary brought written instructions from the testator to the lawyer for the disposal of the property.—*Held*, sufficient to establish that the will was executed under the undue influence of the beneficiary.

2. Where a beneficiary under a will occupies a position of trust and confidence towards testator, the burden of proof is on him to show that the will was executed without any undue influence.

*Mr. David F. Barkman* and *Mr. Willard W. Cutler,* for the appellants.

*Mr. Mahlon Pitney,* for the respondent.

MAGIE, ORDINARY.

These two appeals were taken from a decree of the Morris county orphans court, refusing probate of an instrument offered for probate as the will of Jonathan Edwards Richards, deceased.

Barkman was named as the executor in said instrument, and

Benjamin is the principal beneficiary thereunder. The appeals presented the same question and were argued together.

The legal principles applicable in this case are not in dispute. The appeals present only questions of fact, and require a determination whether there was error committed in the court below in its deductions from the voluminous evidence presented before it, or in the application of the settled and admitted principles of law.

It is a matter of regret that I am not favored with any opinion of the court below indicating the grounds upon which it arrived at the conclusion that the instrument offered should not be admitted to probate.

I will briefly express the conclusions I have reached:

*First.* At the execution of the paper-writing, the deceased was in possession of such testamentary capacity as he had, and his mind was not affected by the disease under which he was then suffering. The paper in question was shown to have been executed with all the formalities required by law to make it a valid testamentary disposition.

*Second.* The proofs also indicate that the deceased possessed such degree of capacity as, under our liberal rules, enabled him to make a valid disposition of property by will.

But the evidence also discloses that he was a man of weak mind and of an intellect below the average. He was infirm of purpose, and, although he had had the opportunity of education, he had (whether from inability to learn or from his reckless disposition does not clearly appear) acquired merely the rudiments of education. He possessed no business qualifications, and out of the small income which he had, it is shown by the evidence that he had been led into ill-advised and absurd purchases. The evidence indicates what several of the witnesses express, that while he had attained the state of a grown man, he remained a mere boy, childish in his disposition and heedless in his conduct. It further appears that he was easily influenced and led by those who were in immediate contact with him.

*Third.* As deceased possessed testamentary capacity, and the instrument was duly executed according to law as a will, it should have been admitted to probate, unless the claim of respondent

(who is his sister and next of kin, and who filed a *caveat* against its probate) that it was not the will of deceased, but was produced by undue influence of the principal beneficiary, is sustained by the proofs.

Primarily, the burden of establishing a charge that a paper-writing was procured from the person who executed it by undue influence rests upon the party who asserts it. But when a will confers a benefit upon one who occupied, in respect to the deceased, a position of trust and confidence, and particularly when the deceased was of weak mind and subject to influence, and the beneficiary has the opportunity to exert such influence, the burden is cast upon him to show there was, in fact, no undue influence. *Dale* v. *Dale, 11 Stew. Eq. 274.*

The deceased became an inmate of the family of Benjamin about Christmas, 1899, when he was in the last stages of consumption. He remained an inmate of Benjamin's family until his death, March 29th, 1900. The disputed writing was executed January 27th, 1900. The evidence discloses that Benjamin, the beneficiary, is a man in active business, intelligent and acute. He was not a relative of the deceased, nor, although they were boys together, does the evidence disclose that there had been any previous close intimacy between them. It thus appears that the beneficiary, a man of active, strong mind, had the opportunity to influence a man of weak mind, susceptible of influence, and in the last stages of a mortal disease.

Benjamin was asked by the deceased, shortly after he became an inmate of the family, to procure him a lawyer for the purpose of making discovery with respect to the right of deceased in certain trust funds in the hands of a relative of deceased, and especially whether deceased had received or was receiving the proper allowance from the trustee. Benjamin recommended the employment of Barkman, who shared with Benjamin an office in Morristown. Benjamin took the deceased upon one or more occasions to the office, and Barkman, under the employment of the deceased, commenced some proceedings with respect to the trust. It appears that during the proceedings respecting the trust, the deceased proposed to make a will. No instructions were then given, but afterwards Benjamin informed Barkman that the de-

ceased desired him to come to Benjamin's house to take such instructions. Barkman was unable to go at once, and suggested to Benjamin that the deceased should send him written instructions. Such instructions were written by the deceased, and the paper was produced in the case. It was couched in these words:

"My interest in New York City property I will to my friend Mr. William H. Benjamin.

"All my personal property that belongs to me at the time of my death I will to my friend Mr. William H. Benjamin."

Benjamin took this paper to Barkman, and Barkman advised him (1) that there should be an executor of the will appointed, and (2) that it was advisable that the will should contain a legacy of some amount to the respondent, known by both Benjamin and Barkman to be the sole next of kin. What then occurred is not clear. Barkman says that Benjamin proposed that he (Barkman) should be made executor. Benjamin says that he proposed to consult the deceased, and did consult the deceased, and reported to Barkman that the deceased desired him to be the executor. With respect to the legacy to the sister, the inference is justifiable that it was advised by Barkman, with a knowledge that it might be contended that deceased did not possess testamentary capacity, and with an idea that the inclusion of a legacy to the sister would indicate that he knew the relative to whom affection would naturally prompt some benefit, and limited the benefit to the amount of the legacy.

It further appears that Benjamin continued to transmit messages from the deceased to Barkman and from Barkman to the deceased, and that Barkman made a draft of a will which came into the hands of deceased by the medium of Benjamin. It further appears that Barkman plainly, without further instruction, redrafted the will, and went to Benjamin's residence with the redrafted paper. That was the will which was executed by the deceased, and the previous draft was destroyed. No satisfactory explanation seems to be given of the redrafting of the instrument.

These and other facts, which clearly appear in the evidence, in my judgment, justify the inference that Benjamin, from the

time that deceased became an inmate of his family to the time of the execution of the will, occupied a position respecting this weak-minded person which was a relation of trust and confidence, and that to establish this will, the burden is upon Benjamin to show that it was executed by the deceased without undue influence, dominating him to make this will which ignored his relatives and gave practically his whole estate to a comparative stranger.

I have examined the evidence with care, with the result that I conclude that Mr. Benjamin has not sustained the burden which the circumstances cast upon him. Although his evidence professes to give a frank and full statement of the intercourse between him and the deceased and to repudiate the idea that he exerted influence upon the deceased, I feel obliged to conclude that a full disclosure has not been made, and that what is disclosed clearly indicates that influence was exerted, and exerted by him. When the deceased was informed by Benjamin that Barkman suggested the legacy to the sister, Benjamin admits that the deceased was unwilling to make such a bequest, yet he did yield to the suggestion and made such a bequest, and plainly he did so because of the influence of Benjamin or Barkman, acting after his interview with Benjamin. Besides, when I compare the letter written December 16th, 1899, by the deceased to Benjamin, which is plainly the writing of a man of inconsequential mind, with the instructions written by deceased and carried by Benjamin to Barkman, I find it impossible to believe that the instruction was so written without coaching or suggestion from someone.

These and other circumstances lead me to the conclusion that Benjamin has failed to sustain the burden of proof cast upon him, and that the paper-writing produced and executed by Jonathan E. Richards ought not to be considered his will or admitted to probate as such.

The decree below must be affirmed.