15 N.J. Super. 354 (1951)
83 A.2d 451
EDITH BRINKMAN, ET AL., PLAINTIFFS-APPELLANTS,
v.
URBAN REALTY CO., INC., TEANECK GARDENS, INC., SIDNEY SARNER, RALPH J. SOLOW AND GEORGE L. MARCUS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1951.
Decided September 24, 1951.
*356 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Warren Dixon, Jr., argued the cause for appellants.
Mr. Walter D. Van Riper argued the cause for respondents.
The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
Defendant, Teaneck Gardens, Inc., constructed apartments in Teaneck, Bergen County, financed by a $1,592,000 bank mortgage. The mortgage was insured under the National Housing Act which originated in chapter 847 of Act of June 27, 1934 (48 Stat. 1246; Title 12 U.S.C.A., secs. 1701, et seq.). To qualify the mortgage for insurance within the regulations of the Federal Housing Administration, the certificate of incorporation of Teaneck Gardens, Inc., included a provision that, *357 without prior approval of the holders of a majority of its preferred stock (that is, the Federal Housing Administration) the corporation would not "permit the occupancy of any of the dwelling accommodations of the corporation except at or below the rents fixed by the schedule of rents provided hereinafter." On July 27, 1948, a rental schedule submitted by the corporation was approved by the Federal Housing Administration.
Defendant, Urban Realty Co., Inc., was organized in March, 1948, and shortly thereafter entered into an agreement with defendant, Teaneck Gardens, Inc., by which Urban was named exclusive rental agent for the apartments.
The plaintiffs are numerous tenants who entered into leases during the months of April through August, 1948. Each lease was for three years and recited a rental at the maximum stated in the approved schedule. However, before his lease contract was consummated each tenant was required to pay Urban a "commission" of 5 per cent of the gross three-year rental in accordance with an agreement with Urban signed by the tenant when applying for an apartment. The agreement reads as follows:
"I, or We, the undersigned, hereby employ Urban Realty Co., Inc., to act as my or our Agent and Real Estate Broker, to procure an apartment in Teaneck Gardens, Inc., and hereby agree to pay a commission at the rate of (5%) Five Per Cent on the gross rental in the event that the undersigned shall have secured an apartment in the said Teaneck Gardens, Inc.
This agreement to pay commission shall in no way be construed as a bonus or gratuity for the securing of the said apartment."
The plaintiffs' suit is to recover damages equal in amount to the "commissions" so paid, which were stipulated to aggregate $22,525.50. Their actions were dismissed at the close of their proofs, and they appeal from the ensuing judgment.
We are concerned on the appeal only with one of the two theories of plaintiffs' action, the other having been abandoned. The second count of each complaint charges that the individual defendants organized the two corporations and caused *358 Teaneck Gardens, Inc., to give Urban the exclusive rental agency as steps of a conspiracy, that is,
"In order to avoid the restriction contained in the certificate of incorporation of Teaneck Gardens, Inc., against exacting a rental for apartments owned by Teaneck Gardens, Inc., in excess of the schedule of rents as limited by the Federal Housing Administration as a condition for the insuring by said administration of the mortgage loan aforesaid, and as limited by said certificate of incorporation, said Sarner, Solow and Marcus, without the knowledge or consent of the preferred stockholders of Teaneck Gardens, Inc., conspired and agreed among themselves to require as a condition to obtaining for rental of any apartment in the building owned by Teaneck Gardens, Inc., that each person obtaining an apartment therein should be required to pay a so-called commission to Urban Realty Co., Inc., amounting to 5% of the gross rental for the entire period of each lease entered into in the name of Teaneck Gardens, Inc., as lessor."
The trial judge rested his ruling of dismissal upon the ground that even if
"we * * * assume that the evidence is sufficient to warrant a jury in coming to the conclusion that the moneys paid under these so-called brokerage agreements were not paid to or received by the Urban Realty Company for its own benefit, but for the benefit of the other defendants or some of them, but [and?] even if we assume that this result was arrived at by reason of some agreement or conspiracy between the defendants, I think the plaintiffs still fall short of proving a case against these defendants. No law has been called to the attention of the court establishing any maximum rentals which could be lawfully charged for the use of the apartments in question. The fact that such rentals are referred to and adopted in an agreement between the Federal Housing Authority and one of the defendants * * * and the fact that in the certificate of incorporation of the Teaneck Gardens a provision of that kind was made for the benefit of the preferred stockholders I think gives to the plaintiffs in these two causes no right of action. Whatever the purpose was * * * it seems to me that if it had been the intention of Congress to provide that for any exaction above the maximum rents that might be provided for by any regulation of the sort now under consideration, that if they had intended that that was to be for the benefit of the tenants it would have been a simple matter to put in the law such provisions as were contained in the O.P.A. law, clearly defining the tenant's right of action for any exaction on the part of the landlord in excess of the maximum rent permitted to be charged."
*359 Plaintiffs' argument at the trial and on the appeal is that the defendants, in the manner alleged, effected a violation by Teaneck Gardens, Inc., as mortgagor, of a duty laid upon it by the National Housing Act and the regulations thereunder, which violation "gave rise to a cause of action in favor of the plaintiffs as tenants." They concede that the National Housing Act does not expressly grant a private right of action for its violation, as does the Housing and Rent Act of 1947 which explicitly provides that a tenant may maintain an action for damages or penalties against a landlord who exacts rent in excess of authorized rent ceilings (sec. 205, as amended, 50 U.S.C.A. App., sec. 1895). They also concede that the mortgaged premises are not subject to rent control under the Housing and Rent Act of 1947 because completed after February 1, 1947, and thus expressly exempt. 50 U.S.C.A. App., sec. 1892 (c) (3) (A).
It is insisted, however, that the intent of the Congress to impose civil liability at the suit of tenants is to be inferred from the context of section 207 (12 U.S.C.A., sec. 1713 (b) (2)) authorizing insurance of eligible mortgages which cover property held by
"Private corporations, associations, cooperative societies which are legal agents of owner-occupants, or trusts formed or created for the purpose of rehabilitating slum or blighted areas, or providing housing for rent or sale, and which possess powers necessary therefor and incidental thereto, and which, until the termination of all obligations of the Administrator under such insurance, are regulated or restricted by the Administrator as to rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment. * * *" (Italics supplied.)
It is argued that the mandate of the Congress expressed in the quoted language of section 207, that the Administrator (now Commissioner) regulate or restrict rents and the other specified items "to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment," implies an intent to grant tenants a private right of action against a mortgagor who exacts rents *360 in excess of the approved maximum in violation of the provision included in its corporate charter in obedience to a regulation adopted by the Administrator pursuant to the statutory mandate.
At the outset, we note that although plaintiffs' argument assumes that this mortgage was insured under section 207, their brief refers to the mortgage as "an F.H.A. insured mortgage commonly referred to as a Title 608 mortgage." Section 608 came into the National Housing Act as war-time emergency legislation and, as amended, was operative on November 26, 1947, when the mortgage was made. According to a Senate Report:
"In recent years, the bulk of all private rental housing construction has been assisted under the emergency temporary mortgage insurance authorization contained in section 608 of the National Housing Act. This authorization has been used to the almost complete exclusion of mortgage insurance under the permanent rental housing authorization contained in section 207 of the Act." (Sen. Rep. No. 1286 (1950 U.S. Cong. Service, p. 2037)).
Section 608 does not contain the language relied upon by plaintiffs to establish their right of action. The section merely provides that "The Administrator may, in his discretion, require such mortgagor to be regulated or restricted as to rents or sales, charges, capital structure, rate of return and methods of operation." 12 U.S.C.A., sec. 1743 (b) (1). If the fact is that this mortgage was insured under section 608, the crux is removed from plaintiffs' contention. The objectives of sections 207 and 608 are very different. The National Housing Act was a product of the economic paralysis which gripped the nation in 1934. Section 207 was purposed in part to create a system of mutual mortgage insurance to stimulate a revival of the mortgage investment market, but, as well, was intended to assist the construction of better housing accommodations to enable low income groups to have the benefit of improved housing at reasonable rates consistent with a fair investment return. 48 Stat. 1252; 52 Stat. 16; H.R. Rep. No. 1655, 75th Cong., 2d Sess. 4 *361 (1937); Sen. Rep. No. 1300, 75th Cong., 2d Sess. 6-7 (1937). Section 608, on the other hand, was enacted originally to aid the financing of projects designed for rent for residential use by war workers. It was continued after the war's end, amended by Act of May 22, 1946, c. 268 (60 Stat. 214), to repeal the requirement that the mortgaged property be devoted to that use and to substitute a requirement that preference or priority of opportunity in the occupancy of the mortgaged property be afforded to veterans of World War II and their immediate families, and for hardship cases.
However, whether the mortgage was insured under section 207 or under section 608 is immaterial to the question on appeal, because it is clear that plaintiffs have no private right of action for damages by force of either section.
According to the standards of construction applied by the federal courts to federal statutes, and perforce to be employed by us in interpreting this statute, the violation of an obligation arising under a federal statute creates no liability to private persons injured thereby unless the statute discloses an intention, express or implied, that from a disregard of the statutory command a liability for resultant damages shall arise which would not exist but for the statute. See Fairport P. & E.R. Co. v. Meredith, 292 U.S. 589, 78 L.Ed. 1446 (1934). The intent to grant or withhold a private right of action for the violation of said statute, or the failure to perform the statutory duty, is determined primarily from the form or language of the statute. 50 Am. Jur., Statutes, sec. 586; cf. Texas & N.O.R. Co. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 74 L.Ed. 1034 (1930). Where the statute expressly provides a method for enforcement of the obligation it creates, specifying how and by whom the method is to be employed, the statute is usually to be construed as excluding remedies for its violation by other means and in favor of other persons. "If the statute which creates the obligation, whether public or private, provides in the same section or passage a specific means or procedure for enforcing it, no other method than that thus provided *362 can be resorted to for that purpose." Maxwell, Interpretation of Statutes (8th ed. 1937), p. 340.
Both section 207 and section 608 explicitly provide a method, and the same one, for enforcement of the corporate mortgagor's commitments made in respect of regulated or restricted matters, including that pertaining to maximum rents. The Administrator is empowered in connection with the insurance transaction to acquire special stock of the corporate mortgagor (in this instance, apparently, it was preferred stock) "to render effective such restriction or regulation." The stock is redeemable by the corporate mortgagor only "upon the termination of all obligations of the Administrator under the insurance." 12 U.S.C.A., sec. 1713 (b) (2), sec. 1743 (b) (1). "(The) stock or interest will acquire majority voting rights in the event of default under the mortgage or violation of provisions of the charter of the mortgagor or the violation of any valid agreement entered into between the mortgagor, the mortgagee and/or Commissioner, but only for a period coextensive with the duration of such default or violation." Adm. Reg. under sec. 608, sec. V, par. 4 (1947).
Plaintiffs, with reason, say that the proofs depict the defendants as employing the "commission" device with deliberate intent to circumvent the provision of the certificate of incorporation of Teaneck Gardens, Inc., and the contractual commitment as to the maximum rents made with the federal agency. We must conclude, however, that no right in tenants to maintain an action for damages for such breach of faith can be raised by implication from the statute in light of the provision therein granting the Federal Housing Administrator a specific remedy to redress it.
Affirmed. No costs.