68 N.J. Super. 574 (1961)
173 A.2d 422
IN THE MATTER OF THE PROBATE OF THE ALLEGED WILL OF EDWARD E. BAKER, DECEASED.
LORAINE B. HIPP, PROPONENT-RESPONDENT,
v.
HORACE E. BAKER, CAVEATOR-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 1961.
Decided July 20, 1961.
*575 Before Judges PRICE, GAULKIN and SULLIVAN.
Mr. John Warren, Jr. argued the cause for caveator-appellant (Messrs. Parsons, Canzona, Blair & Smith, attorneys; Mr. Warren, of counsel).
Mr. John C. Stockel argued the cause for proponent-respondent.
*576 The opinion of the court was delivered by PRICE, S.J.A.D.
Caveator appeals from the judgment of the County Court, Probate Division, admitting to probate a document dated August 26, 1958 alleged to be the last will and testament of Edward E. Baker, who died October 26, 1959 at the age of 84 years. The proponent of the alleged will, Loraine B. Hipp, and the caveator, Horace E. Baker, are sister and brother and respectively are daughter and son of decedent and are his sole surviving next of kin. With the exception of a minor bequest to decedent's former secretary and a $25 bequest to his son, the challenged document devised decedent's entire estate to his daughter, whom he named executrix. The instrument contained a statement that "I make no other provisions for my said son Horace E. Baker, since I feel that the aid and assistance which I have given to him during my lifetime is sufficiently substantial to discharge any obligation I may have to provide for him, by this, my will."
The principal basic issue litigated was whether proponent had unduly influenced her father to make the will in her favor. Extensive medical and lay testimony bearing on that issue was presented on behalf of the caveator.
As excerpts from proponent's deposition taken before trial pursuant to R.R. 4:16-1 were, on caveator's offer, received in evidence as part of his case, proponent's pretrial partial explanation of some of the factual situations bearing on the issue of undue influence were before the trial court. With this situation existing the trial court at the conclusion of the caveator's case, granted proponent's motion to dismiss the caveat and did not require her to go forward in open court with her proofs. That action, in view of the evidence then before the court, appellant contends constituted error. Appellant asserts that the evidence adduced showed that at the time of the drafting and execution of the document a confidential relationship existed between decedent and proponent; that decedent, then mentally ill and physically handicapped due to the infirmities of age, was under proponent's *577 domination; that the acts of proponent hereinafter described evidenced such control and direction by her in the preparation and execution of the alleged will in her favor as to create a presumption of the existence of such undue influence requiring her to produce affirmative evidence in an attempt to overcome that presumption. Appellant contends that the trial court's peremptory dismissal of his caveat and the resultant probate of the will were unwarranted and erroneous.
To assess the merit of appellant's contention we turn to a consideration of the factual situation. The preliminary proofs presented on behalf of proponent showed that the challenged document was signed by decedent at the Asbury Park and Ocean Grove Bank in the presence of Henry H. Winsor and Clarence N. Foster, respectively the bank's manager and chief teller, whose names appear on said document as attesting witnesses. Neither of the men knew decedent or proponent personally. Mrs. Hipp brought her father to the bank without appointment. She introduced herself and him. The manager testified that the proposed will, fully prepared, was then produced by proponent and at her request he read it to her father and, following its execution, delivered it to her. (We refer later to appellant's contention that the alleged will was not executed in accordance with the applicable statute, N.J.S. 3A:3-2). The manager testified that decedent walked in and out of the bank unaided, seemed fully to understand the provisions of the will as read to him and to comprehend the ceremony of its execution. The teller testified that decedent seemed in good health, composed and unexcited. Following the trial court's admission of the will in evidence over caveator's objection, proponent rested and the caveator proceeded with his proofs.
Although the evidence presented on behalf of the caveator was voluminous, our determination of this appeal does not require that all of the proofs be recited in detail. Reference to the more important factors on which the challenge of *578 the propriety of the trial court's judgment is based will suffice.
It was shown that on February 1, 1940 decedent had executed a will, bequeathing his entire residuary estate to his wife, with the provision that if she predeceased him his estate was to be divided equally between his son and daughter. His wife died July 5, 1954. From that date to June 1, 1958 decedent lived at his son's home in Westfield, New Jersey, with the exception of time spent vacationing in Florida in 1955, 1956 and 1957 and a period during the summer and autumn of 1957 when his son and daughter-in-law were in Europe. During the latter period, from July 10, 1957 to Thanksgiving, decedent lived at the Ocean Grove home of Mr. and Mrs. C.F. Dodd, to whom reference is hereinafter made.
On January 14, 1955 decedent executed a general power of attorney in favor of his son, a member of the New Jersey Bar since 1947. On May 31, 1955 decedent executed a will drafted by his son. The instrument divided his estate equally between his son and daughter and named them co-executors. Just prior to the departure of the caveator and his wife for Europe on July 9, 1957 another will, also drafted by caveator, was executed by decedent. This will also provided for the equal division of the estate between the son and daughter of decedent but designated a banking institution as the sole executor.
On October 10, 1957 decedent executed another will. It, too, was drafted by his son. In addition to bequests to decedent's former secretary and to his daughter-in-law, Ruth H. Baker, wife of appellant, that will provided that decedent's son be released from any "debt" which he might owe testator at the latter's death and further provided that any advancements by the testator to his son "shall be in addition to, and not in satisfaction of, any legacies or bequests given him" by the will. The will then directed that the residuary estate be divided equally between testator's children. The son was designated as sole executor, with the provision that if he *579 predeceased the testator a named bank would be substituted. In February 1958 caveator discussed the October 1957 will at a conference with his sister who had procured a copy of it from decedent. She expressed dissatisfaction with its terms.
Caveator testified that, beginning in March 1958, decedent's physical activity became greatly lessened, his hearing became increasingly defective so that even with the aid of a device, which he commenced using in 1954, he complained of difficulty in hearing; he became careless in his "toilet habits" and in his personal hygiene; he seldom read the newspapers or viewed television programs, although theretofore he had daily devoted many hours to each. Caveator further testified that during the same period his father on occasion behaved peculiarly, would talk to an empty chair or a tree or other inanimate object, and expressed apprehension that "thugs were going to break in and take his money away from him." Commencing June 1, 1958 decedent was taken by his son for a month's stay to the home of Mr. and Mrs. Harry Darby in Westfield. Mrs. Darby was a practical nurse. This transfer, caveator testified, was required because of the need for increased care which decedent's condition demanded and which caveator and his wife, who worked at caveator's office, could not give him.
It was developed on the caveator's case that during this period the caveator had his father examined medically by decedent's family physician, Dr. Ross J. Maggio and a specialist whom the latter recommended, Dr. Arthur T. Colley, both of whom testified. Dr. Maggio stated that decedent had shown "periods of confusion" as early as January 1957; that he worsened during the ensuing 18 months; that the doctor conducted a "complete physical examination" of decedent on June 6, 1958 and found decedent "disoriented" and suffering from "advanced cerebral arteriosclerosis with senility"; that his condition, in the opinion of the doctor, would become "progressively" worse. Dr. Arthur T. Colley, a neurologist and psychiatrist, who *580 examined decedent on June 23, 1958, testified that in his opinion decedent was then "phychotic secondary to cerebral arteriosclerosis and senile brain changes"; that decedent was "no longer able to fully appreciate reality" and was then unable to manage his own affairs. He signed a certificate for decedent's admission to Marlboro (a mental institution) which certificate was never used.
On June 25, 1958 a second conference was held with reference to the October 1957 will. Present were the testator, proponent, her husband and appellant. The conference was acrimonious. Mr. and Mrs. Hipp had learned about the medical examination by Dr. Colley and accused the caveator of endeavoring to have decedent committed to Marlboro which the caveator denied. He said that he was hoping to place decedent in a nursing home which he identified. The caveator testified that his brother-in-law objected strenuously to the provision in the will for satisfaction of caveator's indebtedness to decedent and to caveator's appointment as sole executor and stated he had taken a copy of the above will to his own lawyer who criticized it. Appellant further testified that Mr. Hipp said: "If my wife doesn't get her 1/2 share of her father's estate, I am going to blow the lid off the roof of this Baker family right here in Westfield." Appellant related that during the conference, which lasted "nearly an hour," decedent said: "Why don't I just give you my money now  both of you * * * and get it all over with" and at the end of the conference asked: "Well, is everybody satisfied now?"
At the above conference it was finally arranged that a new will would be drawn in which a provision would be inserted that the two children of decedent would be treated on the same basis with reference to debts and advancements and that appellant would serve as executor without compensation. Such proposed new will was drawn on June 29, 1958 by appellant and delivered by him to the Darbys "for transmission" to the testator. Proponent and the caveator conferred again on June 30, 1958. He testified that Mrs. *581 Hipp then stated that she and her husband desired that the clause as to advancements be eliminated. That was done. Mrs. Hipp retyped part of the will at caveator's office on June 30, 1958. Caveator testified that he and his sister on that day went to the Darby home; that she said to decedent: "Dad, this is the will that we have agreed upon. Will you sign it"? He did so with the Darbys functioning as witnesses. Provision for equal distribution of the residuary estate between proponent and caveator remained. On the same day proponent took her father from the Darby home to reside at the Dodd home. He remained there until his death 16 months later.
Mrs. Dodd testified that on or about July 11, 1958 the following statement, signed by Mrs. Hipp as "attorney" was delivered by Mrs. Hipp to her:
"July 11, 1958.

TO WHOM IT MAY CONCERN
Mrs. Curwin Dodd who is taking care of my Father, Edward E. Baker, is hereby instructed not to allow him to see anyone unless she or her husband are present. Further, he is not to leave her home in the company of my brother, Horace E. Baker or any member of his family, or any other persons unknown to her without my permission. Mrs. Dodd has my authorization to call the Police if necessary to enforce these requirements.
 /s/ Loraine B. Hipp
 Loraine B. Hipp, Attorney"
Mrs. Dodd testified that when proponent brought decedent to the home of the witness on June 30, 1958 she noticed "a great change" in him. She described in detail senseless comments and actions on his part. She further testified that prior to August 26, 1958, the date of the alleged will under attack, Mrs. Hipp, who lived in Summit, came to the Dodd home in Ocean Grove and asked Mrs. Dodd "on more than one occasion" whether she thought that decedent "is fit to sign the will today" and that she (Mrs. Dodd) answered in the negative; that on the above date Mrs. Hipp said: "You think he is fit to sign it"? and that she replied:
*582 "Well, he is as good as he will ever be." Thereupon, Mrs. Dodd testified, decedent left with proponent for the bank. The witness added: "I think I had told her to go to Mr. Winsor."
A Westfield neighbor of the Bakers testified in detail with reference to decedent's irrational behavior in May 1958 and Mrs. Darby testified to meaningless conduct and nonsensical speech by him during June 1958 while decedent was living at her house.
The caveator testified that in July 1958 a lawyer, Walter P. Romer, purporting to act on behalf of decedent, advised the caveator by a letter received in the mail that decedent had revoked the caveator's power of attorney and directed that all of decedent's papers in caveator's possession be delivered to his father. The caveator complied on July 23, 1958. The proofs show that the aforesaid revocation received in evidence at the trial was signed by decedent under date of July 8, 1958 and that a new power of attorney drawn by Mr. Romer in favor of proponent and signed by decedent bore the same date. It, too, was received in evidence.
The caveator testified that he did not know of the existence of the alleged will, presently under attack, until notified by Mr. Romer by letter dated October 30, 1959, 4 days after decedent's death.
The caveator then presented extensive excerpts from proponent's pretrial deposition, to which reference has hereinabove been made, and her counsel read into the record other portions of the same deposition. In them she described generally her concern over the clause in the aforesaid will of October 10, 1957 with reference to the release of any debts her brother might owe to her father and referred to a conversation with her father in March 1958 when he was at her home for dinner at which time he stated he "didn't understand" the debt clause and that he wanted his two children to "share and share alike." She testified with reference to her concern over her father's power of attorney which her brother formerly held. She alluded to her husband's *583 consultation with a New York attorney and her fear that the estate might be depleted. She described the aforesaid conferences at her brother's office; her criticism at the June 25 conference of any suggestion that her father be sent to Marlboro; her father's express wish that "he wanted a new will"; the subsequent drafting of a proposed new will; the retyping by her of a page of the redrafted will; and the execution of it at the Darby home on June 30, 1958.
Mrs. Hipp further testified that she telephoned to her father at the Dodd home on the evening of July 1 and that he then told her that he wanted her to "have papers drawn up for revoking power of attorney * * * he wanted the revocation of my brother's power of attorney and he wanted to have papers drawn up giving me power of attorney." She stated that she told her father that "he ought to think it over for a while," but that "he called up almost every night that week. He kept waiting for the papers to be drawn up * * *." She related that on July 7, 1958 she conferred with Mr. Romer at his office. Her father was not present. She told Mr. Romer that her father wanted her to "have power of attorney to * * * handle all of his financial affairs," including "the revocation of my brother's power of attorney." She said that Mr. Romer prepared the requested documents and that she took them to her father on July 8. They were executed before a notary public on the same day and proponent thereafter handled her father's financial affairs through the medium of the power so given to her.
Proponent further testified that after the execution of the aforesaid documents her father on the same day asked her "to have a new will drawn up disinheriting my brother"; that "he didn't want him to have a cent of his money"; that she "suggested [to him] that since he had just executed a will, * * * he think it over"; that her father spoke to her on several occasions after that to inquire whether the will had been drawn and that when she visited him on July 15 he told her that if she "didn't have the will drawn *584 up he was going to have it drawn up because he didn't want my brother to have any of his money after what he had done." She further related that her father told her that he wanted her to be executrix and that if "something happened" to her he wanted her "brother-in-law to be executor"; that he wanted the bequest to Mrs. Baker "eliminated" and that he had suggested the $25 bequest to his son and also suggested the insertion of the aforesaid clause in the challenged will which purported to set forth the reason for decedent's disinheritance of his son. Mrs. Hipp testified that she conferred with Mr. Romer about July 21 or 22, the will was prepared by him and she took the document to her father on July 24; that she read it to him and "suggested that he think it over"; that she "saw" her "father and talked with him several times after that"; that she "went away on vacation in the middle of August"; that following her return her father told her (on August 24) that "he made up his mind he was going to execute the will"; that she had the original will in her possession and took it with her to Ocean Grove on August 26, the day of its execution as aforesaid.
On motion by proponent's counsel at the close of caveator's case the trial judge, as stated, dismissed the caveat and admitted the will to probate. In so doing he stated that he believed "that the testator became insecure and confused when he found out that he no longer was welcomed in his son's home and that he might be committed to an insane asylum." The judge added that he determined that "the will was fairly made" and stated that "the unimpeachable and impeccable testimony of the two bankers, Henry Winsor and Clarence Foster, satisfies me of their disinterest that the testator understood what he was doing and was free from any undue influence." The trial court, as noted, reached the foregoing decision on the merits of the controversy without any testimony being given by proponent in open court or by any persons on her behalf other than the attesting witnesses above named.
*585 We hold that the testimony presented in the case at bar was of such a nature as to create a presumption that the challenged will was the product of undue influence; that such presumption was not overcome, as proponent contends, by the reading of excerpts from proponent's pretrial depositions; and that the court should have required her to go forward with her proofs. Certain crucial, undisputed facts, leading to the foregoing conclusion, are revealed by the testimony and exhibits before the court. We emphasize them: (a) the alleged will of August 26, 1958 was drawn by an attorney of proponent's selection who had never met decedent and whose identity, as far as the record shows, was not even known to decedent; (b) the provisions contained in the challenged document were alleged to have been based on decedent's instructions transmitted to that attorney by proponent, the sole residuary beneficiary; (c) the same attorney, also without direct instruction from decedent, had earlier prepared the revocation of the caveator's power of attorney as well as a new power of attorney operative in favor of proponent, who attended to the execution of both documents; (d) the alleged will of August 26, 1958 contained a residuary clause, which, for the first time in decedent's series of wills, gave the decedent's entire residuary estate to his daughter and excluded his son; (e) proponent, a few days after decedent was taken to the Dodd home in July 1958, gave the aforesaid written instructions to Mrs. Dodd, barring anyone from seeing decedent except in the presence of Mrs. Dodd and her husband, and directing that decedent not be permitted to leave the Dodd home with his son or any member of the son's family.
In addition to the above uncontradicted proofs there existed in the record before the trial court medical evidence from decedent's own physician and from a psychiatrist, certifying as above stated to their finding of grave physical and mental deficiencies of decedent present in June 1958, conditions which they believed would grow progressively worse. Added to the foregoing was the aforesaid lay testimony *586 with reference to the irrational speech and behavior of decedent as late as June and July 1958, and finally proponent's inquiries of Mrs. Dodd as to whether decedent "is fit to-day" to sign his will (the document admitted to probate); all of which testimony as to the physical and mental condition of decedent had a bearing on the issue of undue influence. Dale v. Dale, 38 N.J. Eq. 274 (E. & A. 1884); Barkman v. Richards, 63 N.J. Eq. 211, 213 (Prerog. Ct. 1901).
The evidence above recited was such as to require that proponent go forward with her proofs in the presence of the court and that the opportunity be afforded for her cross-examination. The foregoing testimony was of such a character as to require full and frank disclosure by proponent of each of her acts in connection with the challenged will, together with the presentation of such other evidence on her behalf as might be deemed relevant to the issue. In the interest of justice such proofs should include testimony by the attorney who, without consultation with decedent, prepared the alleged will for him and apparently undertook that task on instructions transmitted by one who prospectively was the chief beneficiary of the legal work involved.
The decisions in this state chart the course which the trial judge should have followed at the conclusion of the caveator's proofs then present in the record. He should, because of the facts then before him, have denied proponent's motion for dismissal and required her to go forward with her proofs.
Mr. Justice Wachenfeld in In re Hopper, 9 N.J. 280, 282 (1952), said:
"The burden of proving undue influence usually lies on the contestant, but if a will benefits one who stood in a confidential relationship to the testator and there are additional circumstances of suspicious character, a presumption of undue influence is raised and the burden of proof is shifted to the proponent."
Again speaking for the court in In re Rittenhouse's Will, 19 N.J. 376, 382 (1955), he said:
*587 "On the record before us, we conclude there are presented sufficient circumstances of a suspicious nature requiring explanation which warranted the shifting of the burden of proof from the contestant to the proponent and that his testimony on the record now before us did not have the convincing or impeccable quality required by our decisions to remove the aura of suspicion. In re Morrisey's Estate, 91 N.J. Eq. 480 (Prerog. 1920); In re Heim's Will, 136 N.J. Eq. 138 (E. & A. 1945)."
Judge Clapp, speaking for this court in In re Weeks, 29 N.J. Super. 533 (App. Div. 1954), said (at pp. 539-540):
"* * * However, we conclude, the moment this presumption is erected, both the burden of proof (which otherwise would have been upon the contestant, Gellert v. Livingston, 5 N.J. 65, 1950, * * *) and the burden of going forward with proof, shift to proponent and are identical and coincident. To meet each of these assignments, the proponent must establish by the same quantum of proof  that is, by a preponderance of the proof  that there is no undue influence. * * *
There is another matter to be borne in mind. The presumption of undue influence is of that class of presumptions by which a litigant (here the proponent) is called upon to make known facts more easily accessible to him than to his adversary. See, generally, Morgan, supra, 47 Harvard L. Rev., at p. 77; cf. Brinkman v. Urban Realty Co., Inc., 15 N.J. Super. 354 (App. Div. 1951). Therefore, where a presumption of undue influence is created, the law puts upon proponent the burden of coming forward with credible `evidence satisfactorily explaining his conduct' and stating what he knows as to the making of the will. * * *"
See also, Gellert v. Livingston, supra, 5 N.J. 65, 71 (1950); In re Blake's Will, 21 N.J. 50, 55-56 (1956).
For the reasons herein expressed the judgment of the trial court, dismissing the caveat on proponent's motion and admitting the will to probate, is reversed and a new trial granted. As a complete new trial is to be had, no views are expressed by us on the proofs now before us with reference to the ultimate issues involved in appellant's claims advanced on this appeal that the challenged instrument was not executed in accordance with the requirements of N.J.S. 3A:3-2, and that it was the product of undue influence. Those issues are to be resolved on the basis of the evidence *588 to be presented on the new trial when, with all the proofs before the court, the decision will have a degree of finality not possible on the record before us where proponent was not required by the court to go forward with her proofs. At such retrial, if evidence of the type and character envisioned by the above cited decisions referable to alleged undue influence is produced, the court is to be guided by the principles therein enunciated and is to adhere to the procedure which those decisions direct should be pursued.
We deem it necessary to note that, while it is apparent from the foregoing factual recital that the bitterness of the family controversy here involved was intensified by the activities of both the proponent and the caveator vying for advantage, there is little doubt that many of the legal difficulties presented had their genesis in circumstances which could and should have been avoided. We express the view that, absent extraordinary circumstances not here present, there is no justification for an attorney to prepare a will without conference with the prospective testator and without having first hand knowledge of the many crucial facts and factors inherent in the performance of such important professional work for a client. In the case at bar, as stated, the attorney not only did not meet and confer with the person whose proposed will he drew, he did not even know him.
Although not a factor in the present disposition of the instant case, we disapprove of lay persons undertaking without legal guidance or supervision to perform the solemn function of witnessing a will, a task which, because of its importance, must be performed with strict adherence to the statutory formalities, emphasized by Mr. Chief Justice Vanderbilt in In re Hale's Will, 21 N.J. 284, 296-297 (1956). See also, In re Petkos, 54 N.J. Super. 118, 123 (App. Div. 1959), certification denied 30 N.J. 150 (1959).
The judgment of the trial court is reversed and the cause remanded for action not inconsistent with this opinion. There will be no costs allowed on the present appeal.